## Case No. 4,776.

### FIELDS v. SQUIRES.

[Deady, 366.] [1]

Circuit Court, D. Oregon. Feb. 15, 1868.

W. W. Chapman, for complainant.

W. W. Page and W. Lair Hill, for defendant.

DEADY, District Judge. By this suit the complainant seeks to have his title to the north half of block G in the city of Portland ascertained and declared, as against the defendant, and also to obtain a decree against such defendant for specific perform-

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

ance of the covenant of her ancestor for further assurance, in regard to said block.

From the bill it appears, that on June 25, 1850, Daniel H. Lownsdale, Stephen Coffin and W. W. Chapman, had surveyed and laid off divers lots and blocks in the town of Portland, and made a map thereof, designating the same by numbers and letters, and being in possession, said Lownsdale, Coffin and Chapman by deed of that date, assumed and represented themselves to be the proprietors of the town of Portland, and "for a valuable consideration, thereby released, quitclaimed and confirmed, unto the the said Chapman, to have and to hold to him and his assigns forever, a certain two acre block of land, situate in said town, and represented upon the map thereof by the letter 'G,' and then and there delivered to him the possession thereof. That 'the said grantors in and by said deed covenanted to and with the said Chapman, that the property aforesaid, unto him, his heirs and assigns, they would warrant and defend against all claims, the United States excepted; and that if they should obtain the fee simple of said property from the United States, they would convey the same to the said Chapman by deed of general warranty."

That on March 7, 1851, Chapman sold and conveyed the north half of said block G to William Dobleblower, and gave him possession, and that on August 27, 1852, Dobleblower sold and conveyed said north half to complainant, and gave him possession, which possession he still retains. That on September 22, 1848, said Daniel H. being a widower and unmarried, settled on the tract of land embracing block G, and containing less than 320 acres, and continued such residence and settlement for more than four years thereafter, and thereby became the owner of the same under the donation act of September 27, 1850. That in the year 1850 or 1851, Daniel H. intermarried with Nancy Gillihan, the widow of William Gillihan, and in April, 1854, said Nancy died intestate. In the year 1862, Daniel H. died intestate. On October 17, 1860, a patent certificate issued from the U. S. land office, at Oregon City, for the land settled by Daniel H., to him and the heirs-at-law of his deceased wife, in which certificate, the west half of said tract of land embracing block G, was assigned to said heirs-at-law. That at the time of the marriage, between Daniel H. and said Nancy, the former was the father of three children by a former wife—namely: James P. O., Mary E., and Sarah; and the said Nancy was the mother of two children by her former husband—William Gillihan—namely: Isabella Ellen and William. That in the year 1848, Nancy and her former husband—Gillihan—settled on a tract of land, situate on Sauvie's Island, in Multnomah county, containing less than 640 acres, and continued to reside upon and cultivate the same, until some time in the year 1850, when said Gillihan died—having done and performed all things in and upon said land, as contemplated by the said act of September 27, 1850, up to the time of his death, by means whereof the widow of said Gillihan became and was entitled to one half of said tract, and is therefore not entitled to any part of the donation claim of said Daniel H. That, if notwithstanding the premises, the said Nancy was entitled to a part of the donation claim of the said Daniel H., she had notice, and good reason to be informed, that the said Daniel H. had sold and conveyed block G as aforesaid, "and that she took such part subject to the contract aforesaid of the said Daniel H., and that her heirs and assigns are bound thereby."

That on the death of Daniel H., he left as his heirs-at-law, the said James P. O., Mary E. (now wife of William E. Cooper), and Ida Squires the defendant, and Emma Lamb, children of the said Sarah, deceased, and Millard O. and Ruth A., children of the said Daniel H. and Nancy; and that on the death of the said Nancy, she left as her heirs-at-law, the said William and Isabella Ellen Gillihan and the said Millard O. and Ruth A. Lownsdale. That in the year 1860, Daniel H. purchased from the said Isabella Ellen (then intermarried with William Potter) and her husband, "all the right, title and interest of the said Isabella in said tract of land as the heir of said Nancy;" and that by means of the death of said Nancy and the purchase aforesaid, the same Daniel H. became "the owner and holder of the title of the government of the United States of two fifths of the lands alleged to be patented to the said heirs of Nancy," including block G, and that thereupon "the said two fifths interest in the north half of said block enured to the use and benefit of the complainant."

That in 1864, the said William Gillihan, Jr., by his guardian Martin Gillihan, commenced a suit in the circuit court for the county of Multnomah, state of Oregon, for a partition of the tract of land patented to the heirs-at-law of Nancy, claiming in such suit to be entitled to one undivided fifth thereof; and that the heirs-at-law of both Daniel H. and Nancy, as well as the grantees and assignees of the former were made parties to such suit; and that by the decree rendered therein, the said two fifths of said tract of land was recognized as having belonged to said Daniel H., "with all the equities in partition." And divers lots and blocks in said tract having been before then laid off and "disposed off" by the said Daniel H. and improved by different persons, were allotted to the heirs, grantees and assignees of the said Daniel H.; and to make partition equal the said lots and blocks were severally encumbered with large sums of money, which if not paid within a specified time, should be sold to pay the same; and that if

any claiming under the said Daniel H., and paying such assessments, should be afterwards evicted, that the sum so paid and interest should continue a lien on the particular tract for reimbursement. That the said block G was among the blocks so assigned in partition to the heirs and grantees of the said Daniel H., and the sum of $998.79, and $—— costs, was assessed upon the north half of said block, which the complainant was compelled to and did pay to prevent the same from being sold.

That the defendant, Ida Squires, though a resident and citizen of Kentucky, had a guardian (the said William E. Cooper), a resident of the city of Portland, and that said guardian and his ward well knew that the complainant was about to pay said sum, claiming this property as his own, yet neither of them made any objection thereto, but suffered and encouraged the complainant to pay the same: "Whereby the said Daniel H. in his life time and his heirs-at-law since his death, became and are bound to convey the said half block to your orator, by a good and sufficient deed;" and that the said Ida Squires, by virtue of the covenants in the deed of June 25, 1850—the possession of the complainant, and the said decree and the payment of the assessment thereunder is estopped to set up the title of the said Daniel H., so obtained as aforesaid, as a defence to the suit of the complainant. That the defendant paid Dobleblower $250 for the premises in question, and has since expended about $2,700 in improving the same, and that his possession from the date of such purchase until the present time has been visible and notorious, to the knowledge of Daniel H. and Nancy while living, and of the heirs of the former since his decease; and that at the date of such purchase, Daniel H. "assured the complainant that the title was good," which assurance said Daniel H. in his lifetime 'frequently' repeated to the complainant—by means whereof the defendant as heir-at-law of Daniel H., is estopped and ought to be barred from asserting any claim to the premises, or denying your orator's right thereto." The defendant demurs to the bill, and maintains in argument, that upon the facts stated, the complainant is not entitled to any relief.

The objections of the defendant, as specified in the demurrer and developed and amplified on the argument, involve the consideration of questions, some of which, besides being interesting in themselves, are of the highest practical importance to this community. The deed is objected to as inoperative and void because Chapman is both grantor and grantee, covenantor and covenantee, therein. Of course, Chapman could not grant to himself or covenant with himself. So much of the deed may be treated as surplusage—a blunder of the scrivener. There still remains, the grant and the covenants of Lownsdale and Coffin to and with Chapman, and these are easily and fairly divisible and separable from the void and repugnant grant and covenants by Chapman to and with himself. Waiving this objection, it is further objected, that the covenants with Chapman by Lownsdale and Coffin are joint and not several, and that therefore the remedy upon them must be joint—against both Lownsdale and Coffin or their representatives.

Counsel for the complainant maintains that equity will treat these covenants as joint or several, and among others cites Duvall v. Craig, 2 Wheat. [15 U. S.] 45, and 1 Story, Eq. Jur. 162, 163. But neither of these authorities support the position. In Duvall v. Craig, supra, the question was not whether the covenant could be treated as joint or several, but what constituted a breach of it. The case only decides that a joint covenant against encumbrances is broken by an encumbrance suffered or done by a part of the covenantors, and that all the covenantors are liable for such breach. To the same effect is Merriton's Case, Noy, 86, cited in the note to Duvall v. Craig. There the lessors covenanted against any encumbrance made by them. One of the lessors made a lease to a stranger. In an action on the covenant against both lessors, it was held that the act of one constituted a breach, for which the lessors were jointly liable. The citation from Story only goes to the extent, that in equity a joint debt will be deemed the several debt of each of the contractors in a certain class of cases, from the fact—either proven or presumed from the nature of the transaction—that each of the contractors had the benefit of the money advanced, or that the joint obligation has been given to pay an antecedent debt, for which all the obligors were severally liable. But "when the obligation exists only in virtue of the covenant, its extent can be measured only by the words in which it is conceived." 1 Story, Eq. Jur. 163. The general rule upon this subject seems to be well expressed in Rawle on Covenants (578): "Whether the liability created by the covenant be joint or several, or joint and several, obviously depends upon the terms in which it is expressed. Where an obligation is created by two or more, the general presumption is that it is joint, and words of severance are required in order to confine the liability of the covenantor to his own acts."

In support of the text the author cites among others Comings v. Little, 24 Pick. 266. In this case the court say: "The distinction is this: Where a man covenants with two or more jointly, and the interest and cause of action of the covenantees is several, each of the covenantees may bring an action for his particular damage, notwithstanding the words of the covenant are joint. But when two persons covenant jointly with another, a joint action lies for the covenantee on a breach of the covenant by one of the parties only, because they are sureties for each other for the due

performance of the covenant." In the case under consideration the covenants are joint —they are the joint contracts of Lownsdale and Coffin with Chapman. An action at law for the breach of these covenants could not be maintained against either of the covenantors separately. But this is a suit in equity, not for damages for a breach, but to declare the legal effect of the one covenant and obtain the specific performance of the other, as against the heir of one of the covenantors on account of her interest in the land embraced in the covenant of her ancestor. As appears, Coffin has no interest in the land and can claim none. At the date of these covenants this was public land of the United States, and it must have been within the contemplation of the parties that if the property was subsequently acquired from the United States, it would be by one of the covenantors and not all of them. In such a case, I think the rule of law applicable to actions at law wherein the covenantee seeks to recover damages from the covenantors for a breach of the covenant, does not apply.

The defendant as heir-at-law of Lownsdale, appears to have inherited a separate interest in the property in question, of which the complainant by this suit seeks to obtain a conveyance on account of the covenant of her ancestor. The suit is to enforce performance of this covenant, not as a whole but as to a separate interest, which has descended to this heir, and as to such interest no other person is liable or interested as defendant; nor can such covenant be enforced in this particular against any other person, than this defendant.

Counsel for the defendant also object that the heir is not liable upon these covenants, because not named therein. The authorities cited in support of this position, are cases that arose under the ancient feudal warranty, and not the personal covenants contained in modern conveyances. Common law warranty was created without covenant, and was a natural incident of the feudal tenure. By the joint operation of the statutes de bigamis and quia emptores, the law was changed so that this warranty did not have the effect to bind the heirs unless mentioned in it. Rawle, Cov. 2, 3, 203. The authorities cited refer to this kind of warranty and are not applicable to the case under consideration. The covenants in this deed are deemed to run with the land, "and pass to the heirs of the purchaser and also to all persons claiming under him, who may maintain actions against them, against the vendor or his heirs." Cruise, Dig. tit. 32, c. 26, § 66. In support of this rule the author last quoted cites from 4 Ves. 370, as follows: "Rachel Boyes and her son conveyed a copyhold estate to a mortgagee by lease and release and covenanted for further assurance. The son died; and the

mortgagee filed his bill against the customary heir of the son, who was an infant; praying that he might be decreed to surrender the estate to the plaintiff. The master of the rolls (Sir R. P. Arden) said, he was clearly of the opinion that this covenant was a contract for a valuable consideration, affecting the land and would affect the heir. And by the decree it was declared that the covenant in the mortgage deed, bound the land descended to the defendant." To the extent which these covenants affect the land, the heir is bound by them, though not named in them, so far as any interest which she may have by descent from the covenantor. Being so bound, the grantee or his assigns are entitled to maintain this suit against the heir as they would against the ancestor if now living.

Counsel for defendant further object that the complainant is not the assignee of the covenants in the deed, because he is the grantee of only one half of the premises embraced in the deed and to which the covenants relate. This objection rests upon the consideration that the covenantor ought not to be subject to a multiplicity of separate suits, by subsequent grantees of separate parcels of land, which he conveyed and covenanted concerning as a whole. But the law after some fluctuation, seems now to be well settled otherwise. In 2 Washb. Real Prop. 662, the author says: "The action for breach of this covenant (of warranty), should be brought by him who is the owner of the land, and, as such, the assignee of the covenant, at the time it is broken. Such covenant is moreover susceptible of division into as many parts or interests, as the land itself shall be divided into by subsequent successive conveyances, so that if A convey to B two parcels by one deed, with a covenant of warranty, and B sells one of them to C who is evicted by an elder title of the parcel so purchased by him, he may have covenant in respect to the same against A." The same rule is laid down as to all the covenants which run with the land in Rawle, Cov. 354, 355. Rawle cites the opinion of Lord St. Leonards (Sugd. Vend.), and says: "This view of the law has been adopted in this country." The opinion cited was upon a similar case to the one put by Washburne. "The better opinion seems to be, that an alienee of one of the estates could maintain covenant against the covenantor where the covenants run with the land, and as such, an action would lie either for damages, which would be measured by the loss of the assignee, as far as he might be entitled to recover it under the covenant, or for an act to be done, e. g. further assurance, which might be confined to the particular proportion of the property. It does not seem that any injustice would arise by suffering several covenants to lie, although it might expose the covenantor to inconvenience, whereas the denial of the right to each assignee might lead to positive in-

justice, or if not, to greater inconvenience on their part."

One of the grounds for the relief prayed for in the bill, is that Nancy did not take any share or interest in the donation of Daniel H., and therefore Daniel H. acquired the whole of such donation from the United States, including the premises in controversy. The reason alleged is, that Nancy was entitled to a share of the donation of her former husband—Gillihan, and therefore disqualified to take a share of the donation of Daniel H., on account of the proviso to section 5 of the donation act (9 Stat. 497): "That no person shall ever receive a patent for more than one donation of land in said territory, in his or her own right." From the statements in the bill, it appears that Gillihan had not completed his four years' residence upon the land on Sauvie's Island at the time of his death, so as to entitle Nancy to claim as his wife under section 4 of the donation act; and moreover, Gillihan being dead at the passage of the act—September 27, 1850—was not comprehended in the grant made by said section 4, and therefore Nancy could not claim a donation as his wife in the land occupied by him during his life. This question must be considered as not open to argument in this court, and needs no further discussion. Ford v. Kennedy, 1 Or. 166; Lamb v. Starr [Case No. 8,021].

But the complainant further contends that Nancy was not entitled to take a share of the donation of Daniel H., because such donation only included the number of acres (320), which he was entitled to hold as a single man, but that if she is allowed to take in such donation, she must take subject to the acts and contracts of Daniel H. before her marriage with him, and of which she then had notice. The facts stated in the bill, from which this conclusion is drawn, are, that Daniel H. settled upon his donation in 1848, and that it contained less than 320 acres. That in 1850 he married Nancy—prior to the passage of the donation act, and after the deed to Chapman, of which she then had notice.

Upon the first part of this position arises the question:—Can a married man exclude his wife from the benefit of the donation provided for her in section 4 of the donation act by simply limiting his settlement to the quantity of land thereby granted to a single man; or, in other words, can a married man claim and receive a grant as a single man? The language of the section is: "There hereby is granted to every white settler * * * the quantity of one half section, if a single man, and if a married man * * * the quantity of one section * * * one half to himself and the other half to his wife, to be held by her in her own right." The evident policy of the law was to give to husband and wife an equal quantity of land, imposing upon the husband, as the head of the family, the burden of performing the services upon which the grant is conditioned,

coupled with the right of selection, within the limits of the act, as to place and quantity. The settlement of a married man is intended for the benefit of his wife as well as himself —to enable her to obtain her equal share of the bounty of the grantor. A married man may occupy less land than the law permits. He may have good reasons for so doing. A particular half section may be deemed of more value than any whole section, open to settlement. In this respect the act commits the interest of the wife to the judgment and thrift of the husband. But he cannot change the law and elect to take as a single man to the exclusion of his wife. The exclusive power of the husband is confined to the selection and location of the land. In any event, the land embraced in the settlement, whether a whole section or less, is granted to the husband and wife in equal parts. Even the division of the donation is beyond his control, as the act vests the power "to designate the part enuring" to each in the officers of the land office.

Neither did Nancy take her half of the donation subject to the deed of her husband to Chapman, whether she had notice of it or not. At the date of the deed and the marriage, this was public land of the United States. None of the parties had any interest in it, or claimed any power over it beyond the bare possession. Subsequently, congress by statute granted the west half of the donation to Nancy in her own right. These words—"to be held by her in her own right," were not inserted in the act without a purpose. It appears that they were placed there for the express purpose of excluding the conclusion that she took in right of or through her husband, and that therefore she would take subject to the previous acts and contracts of her husband—as an heir from an ancestor, or a vendee from a vendor. True, the services upon which the grant is conditioned are to be performed by the husband, yet by the terms and manifest intention of the act, the wife takes and holds as the direct donee of the United States as much as though she was a stranger to the husband. Under these circumstances, Daniel H. had the same power to affect or encumber his neighbor's donation, by a deed to Chapman, as his wife's. The question of notice is immaterial, as there is no privity between Nancy and her husband. Carter v. Chapman, 2 Or. 95. Neither did the grant relate back to the date of the settlement by Daniel H. in 1848, so as to give effect to his deed to Chapman, before Nancy became his wife. The grant was subsequent to the marriage, and "although the act of congress grants the land on account of the prior residence and cultivation, the grant itself cannot be said to take effect before it was made—the time of the passage of the act. A grant of land by statute for considerations transpiring years before, as for military services, takes effect from the date of the grant, and not the performance of the

service. In point of time the grant and the cause or consideration of it, may be identical or widely separated." Chapman v. School Dist. No. 1 [Case No. 2,607]; McCrackin v. Wright, 14 Johns. 193; Allen v. Parish, 3 Ohio, 107.

Before considering the nature and effect of the covenants in the deed, it will be necessary and proper to examine the condition of the subject matter described in the premises, and the nature and extent of the interest thereby released, quitclaimed and confirmed. Covenants cannot enlarge the premises of the deed, but the latter may and often do control the former. "The covenant of warranty is often limited and defined by the subject matter of the grant, as where the deed only purports to convey the right, title and interest of the grantor." 2 Washb. Real Prop. 665; Blanchard v. Brooks, 12 Pick. 66, 67; Comstock v. Smith, 13 Pick. 120. From the language of the bill it might be inferred by a stranger that the grantors in this deed undertook as owners of the land to convey the land, and that the grantee accepted the conveyance upon the faith of this undertaking or representation. But nothing would be more erroneous than this impression, or more unjust to the parties concerned. As a matter of law and public history, it is well known to the court, that at the date of this deed the title to lands in Oregon was in the United States, and that no law had been passed to dispose of it. This was as well known to the people of Oregon at that day—the parties to this deed included—as that they were living in a territory, and not a state. At the same time these lands were freely occupied by the inhabitants of the country, holding, as between themselves, under the laws of the provisional government, the bare possession. It is also true. that at the date of this deed and for years before, it was confidently expected that congress would—as they afterwards did—pass an act donating these lands to actual settlers. In June, 1850, the matter was specially before congress, and the result was the passage of the donation act of September following.

Under these circumstances this deed was made, and it is unreasonable to suppose that it was either executed or received upon the impression that the grantors were the proprietors of the soil or had any interest in it —particularly when it appears that Chapman, the grantee in the deed, was in fact one of the grantors and parties in possession. But the most casual examination of the deed itself, will show this to be so. The operative words in the premises of the deed are those of release and quitclaim. And although by the deed as set forth in the bill, the grantors "released, quitclaimed and confirmed" the block of land to the grantee, yet the natural and legal import of these words is not to assert that the grantors had then any particular estate or interest in the land. This taken in conjunction with the historic fact, that the grantors had then nothing in the block but the possession, with what may be called an expectancy of title from the United States, it may be safely concluded that the deed only passed the actual interest of the grantors—the possession. This was all the grantee took or could have expected at the time; and this is evident from the covenants which he took as security for the future.

These covenants are two in number, and both special or limited. The first is a warranty against all claims—the United States excepted; and the second is for special further assurance — that if the grantors should obtain the fee simple from the United States, they would convey the same to the grantee by deed of general warranty. The title of the United States is excepted in the covenant of warranty and in the covenant for further assurance, it is plainly asserted that the title was then in the United States. By this deed only the right to the possession —the then estate of the grantors—passed to the grantee. By the first covenant Daniel H. and those claiming under him are rebutted from claiming any interest in the premises, however acquired, except an interest or title derived from the United States. The title of the United States being expressly excepted from the operation of the warranty, Daniel H., if living, would not be prevented thereby, from asserting such title to the land, if by any means he should acquire it. The same is true of his heir—the present defendant. This covenant is exactly similar to the covenant in Cole v. Hawes, 2 Johns. Cas. 203, which was to warrant the bargained premises against all claims, except the lord of the soil. In that case the court held that the warranty did not extend to the title or claim of the lord of the soil—the owner of the fee simple. So here, the title of the then lord of the soil—the United States —is excepted from the warranty. As it appears then from the bill, that the alleged interest of the defendant in the premises is derived from the United States, it is not within the warranty of her ancestor, nor in any manner affected by it. Upon this covenant the complainant is not entitled to any relief against the defendant. The second covenant binds Daniel H., if he should obtain the fee simple from the United States, to convey the same to the grantee. This covenant is binding upon all persons claiming by, through or under Daniel H. It being decided that Nancy took a share in the donation of Daniel H., it is admitted that the latter never acquired, by any means, more than an undivided two fifths of the premises in question, and that of this interest he died seized, and it descended to his heirs-at-law. If Daniel H. obtained this interest from the United States, it is within the covenant, and his grantee is entitled to a conveyance from the heirs, but if he did not, it descended to the latter unaffected by the covenant. As to

the acquisition of these two fifths, the case is this—Nancy having died intestate, before the issuing of the patent, her share of the donation, by direction of section 4 of the act, went to Daniel H. and her four children in equal proportions. Some years afterwards, Daniel H. purchased the interest of Isabella Ellen, one of these children. The fifth purchased from Isabella Ellen, was not obtained by the covenantor from the United States, and is therefore not within his covenant to convey.

As has been shown, at the date of this deed, it was expected that congress would or might give this land to Daniel H. Upon the faith of this expectation, Chapman took this deed of release to himself, with the covenant of further assurance, if this expectation should be realized. Beyond the right to the possession, as against the grantors, Chapman took nothing by that deed but a possibility—the promise of a chance—that if congress gave the land to Daniel H., the latter would convey it to him, his heirs, or assigns. This must have been the understanding and intention of all the parties to the deed at the time. Upon this contingency the deed was made, and the covenants entered into. As to this fifth, the chance failed—the contingency did not happen—and so far the covenant never became operative. Congress gave the land to Nancy, and she dying before patent, this fifth went to Isabella Ellen. The latter by this means became the absolute owner of this interest and could dispose of it as she saw proper. Waiving the question of whether she took as the heir of her mother or the donee of the United States, it is sufficient that she was neither the child or heir of Daniel H., and did not claim under or through him. Her interest came to her unaffected by any acts or contracts of Daniel H. When the latter purchased it, he in no sense obtained it from the United States, and was therefore not bound, either in law or morals, to convey it to the grantee in the deed of June 25, 1850. 2 Washb. Real Prop. 665; Rawle, Cov. 192; Comstock v. Smith, 13 Pick. 119; Blanchard v. Brooks, 12 Pick. 66; Ellis v. Welch, 6 Mass. 250. As to the other fifth, the solution of the question is not so apparent and simple. After careful consideration of the authors and authorities upon the subject—keeping in view in the meantime, the expectation and intention of the parties to the deed, I have concluded that Daniel H. took this interest, not by descent as the heir to Nancy, but directly from the United States, as its donee.

There are only two ways of acquiring real property, one by descent, the other by purchase. If a person does not take as heir, he takes by purchase, no matter how he acquires his title. At the death of Nancy—April 15, 1854—there was no statute in Oregon regulating the descent of real property, or declaring who should be the heirs of an intestate, and therefore the subject was regulated by the common law. By this rule, her children were first entitled to take as heirs, and her husband never. The donation act does not prescribe who shall be considered the heirs of a deceased settler or his wife, any more than it prescribes who shall be considered the wife of a settler. Both these subjects are left to the local law—the law of Oregon. Counsel for the defendant maintain that this grant is within the rule in Shelley's Case, and that therefore Daniel H. must be considered as taking by descent from Nancy and not by purchase from the grantor—the United States. The rule in Shelley's Case, as a law of property, has always been in force in this state as a part of the common law, except as to devises by will. If the present case was within this rule, the consequences claimed by counsel would follow. Daniel H. would be considered as taking by descent from Nancy. This being so, he could not be said to have obtained this interest from the United States, and therefore it would not be within the operation of the covenant for further conveyance. Courts and commentators have differed as to the reasons of the rule in Shelley's Case, some resting it upon the grounds of feudal policy, others upon the policy of the law which prefers descent to purchase, or the technical doctrine of the common law, which would not allow that the fee could be in abeyance—not vested in some one. But it is agreed on all hands that it is a purely artificial rule, often in direct opposition to the real intent of the grantor or donor, and therefore not to be extended by analogy.

By the rule in Shelley's Case, if a grant was made to a person for life, with remainder to his heirs in fee or tail, such person, notwithstanding the words of the grant to the contrary, was deemed to take an estate of inheritance, and might alien the fee and bar the heirs. If he died seized it descended to his heirs, but they were not allowed to take the fee, by force of the grant, as purchasers, but only as heirs, by descent from their ancestor. But if the remainder is given to any other person than the heir of the first taker, or to such heir with another person, or to only a portion of the persons constituting the heirs of such first taker, the case is not within the rule, and the persons to whom the remainder is given take under the grant as purchasers. To be in by descent, a person must take as heir—in the quality of heir—and take neither more nor less than the law would give him as heir, independent of the grant. If, by the terms of the grant, the heir is to take exactly what the law would have cast upon him, on the death of his ancestor, the case is within the rule, and he is deemed to be in by descent, and not by purchase. You cannot by any grant or conveyance provide that an estate, after the life of the first grantee, shall go in the exact line of descent, and at the same

time the heirs be considered as in by purchase, and not liable to the incidents and burdens of an estate by descent. 4 Kent, Comm. 215, 232; 1 Washb. Real Prop. 78; 2 Jarm. Wills, 178 et seq.; Richardson v. Wheatland, 7 Metc. [Mass.] 171; Bond v. Swearingen, 1 Ohio, 395. The grant to Nancy took effect from the passage of the act. It was not of an estate for life merely, but of inheritance. Yet by the terms of the grant it was made liable to be determined by the happening of a particular event—namely: her own death before the issuance of the patent. The estate granted her was therefore, what the law calls a qualified or determinable fee, because, although it might have continued forever and descended to her heirs ad infinitum, yet it was liable to be determined—terminated—by the happening of this event, by which, its continuance or extent was limited. This event actually happened, and in contemplation of it, the act limited the estate in Nancy's share of the donation over to third persons in equal parts—her husband and children. Upon the determination of her estate in the land, the act in effect granted it over to these persons. Until this event, the husband and children had a contingent remainder in the land, which thereupon vested in them absolutely. This interest they took as direct donees of the United States by force of the grant, and not as heirs of Nancy, who left nothing for them to inherit, because her estate in the land terminated with her death. They were in by purchase and not by descent. The husband and children derived their interest from the United States, and not from Nancy, and therefore there is no privity of estate between them. 4 Kent, Comm. 9, 126; 2 Washb. Real Prop. 224 et seq.

In support of the position that Daniel H. took by descent from Nancy, counsel for defendant have cited Frizzle v. Veach, 1 Dana, 211, and McNair's Adm'r v. Hawkins, 4 Bibb. 390. The first case was this: In early days a person entered and surveyed a portion of the public land in Kentucky, and died before the issuing of the patent. In pursuance of the law in such cases the patent issued to the heirs of the person who located the land—afterwards execution issued against the estate of the deceased, and a question arose whether the land could be taken on the writ. If the heirs took as purchasers, of course the land was not liable here for the debts of their ancestor, but if they took by descent it was. The court decided that the heirs took by descent. This is not a case in point. Under the system then in vogue in that country an entry and survey of a particular tract of land amounted to a purchase. Thereafter the locator had the equitable estate, and if he died before patent, it descended to his heirs. It went to his heirs, as heirs, by force of the law of descents, and not by operation of the grant. Then they stood in his place and represented him and were entitled to the patent. Bond v. Swearingen, 1 Ohio, 395. The second case so far as it bears upon this is directly against the defendant. It was a devise to A and the children of her body lawfully begotten, forever, with provision that after the death of A, the children, whether sons or daughters, were to have the devise equally. The court held that the estate was limited for life to A, with remainder to the children, and therefore it came within the rule in Shelley's Case, but for two reasons. The devise used the word "children" and not "heirs"—a term of purchase and not limitation. It also gave the devise to the children equally, while the law of descent at the time of the making of the will, cast the estate upon the males to the exclusion of the females and of the former preferred the eldest. The judgment was that the children took by purchase, and not descent. The court said: "The manner in which the estate is limited over to them" (the children, contrary to the law of descent), "precludes all possibility of their taking by descent."

So in this case, the grant in section 4 limited the estate in the land granted, after the death of Nancy before patent, and without will, not to heirs—those upon whom the law would cast it, but to her husband and children. Unless the law of descent, independent of the limitations in the grant, would have cast the estate upon the husband and children, and in the proportions which they took, they take by purchase—as donees of the United States. It is believed that no case can be found which does not agree with this proposition. In these respects a grant by the United States, is to be construed and have the same effect as that of a private person. The grant in section 4 is not couched in the language of a conveyance, though it must operate and be construed as one so far as practicable. When it provides that upon the death of Nancy, before the issuing of the patent, her husband and children shall be entitled to the share or interest in the donation, before granted to her, it may admit of argument whether they take such share by way of remainder or conditional limitation, after the determination of what proved to be only a life estate in Nancy. This is an abstruse branch of the law, and one that has in times past been fruitful of unprofitable subtleties. The question is not material here, for in any view of the case there can be no doubt that the grant is not within the rule in Shelley's Case, and that the material conclusion arrived at is correct—that Daniel H. took this fifth as the donee of the United States, and not by descent from Nancy. He was not an heir of Nancy, and could not inherit from her. The donation act does not pretend to make him her heir or call him such, and should not be so construed, in the absence of clear and express language to that effect. The object of this act was to make

grants of land to actual settlers in Oregon, and not to establish or change the law of descent. The power over this subject, as "a rightful subject of legislation," had been already delegated to the territorial legislature. [Act Aug. 14, 1848] 9 Stat. 323. Had the gift been to Daniel H. of the whole interest of Nancy, upon the contingency that she died without children, it would not be different in legal effect from the case under consideration. Yet the survivor, so far from being thereby made an heir, would take in opposition to and exclusive of the heirs. Even if he only was admitted to take an equal proportion with them, he would thereby take so much from them. The estate was not to go in the ordinary line of succession. The survivor takes that which the law of descent would give to the heirs, and the latter take so much less than they would if claiming as heirs. This being so, neither of them take in the character or quality of heirs, but as donees from the United States.

It is also evident that the purpose of congress was, in case of the death of the settler or his wife, without will, between the date of the act and the issuing of the patent, not to allow the share of the deceased to descend to his or her heirs generally, but to give it first to certain members of the family, without reference to the local law of descent. Independent of the intrinsic justice of this provision, it might have been dictated by a desire to prevent any uncertainty concerning the condition and disposition of the grant, if the grantee should die before patent. With the conclusion now reached, coincides the justice and equity of this case. As to this fifth it was obtained by Daniel H. under just such circumstances as the parties to the deed contemplated when this covenant was made and accepted—by gift from the United States. The complainant, as the assignee of Chapman, is entitled under the second covenant to a conveyance of this fifth from the heirs or grantees of Daniel H.

Before leaving this subject, it is proper to notice some minor objections to the enforcement of this covenant, insisted on by counsel for defendant. It is claimed that there is no breach of the covenant for further assurance, because it does not appear that the complainant has devised or demanded any particular assurance or conveyance. Where the covenant is general and does not specify the particular conveyance to be made, but only such as may prove necessary or be advised by counsel, the party claiming under it should demand such a conveyance as he conceives himself entitled to, or counsel shall devise, before he can allege a breach and maintain an action for damages. In such case, until the party bound to make further assurance is advised as to what is demanded, or needed, he cannot be said to be in default for not performing it. This is the rule in actions at law for damages, which can only be maintained when an affirmative breach of the covenant

is shown. But, I apprehend it will be found that the rule has little application to a suit in equity for the specific performance of a covenant. Such suit is not maintained upon a technical breach of the contract, but upon its continuing obligation, binding the party to perform it specifically. In the absence of any special provision in the covenant to the contrary, the suit itself is a sufficient demand for performance. This covenant is special, and requires the performance of a particular thing—the conveyance of the property if obtained from the United States. A neglect to perform such a covenant, for the purposes of this suit, is equivalent to a refusal to do so. In this respect the covenant does not differ from an ordinary agreement to convey real property. Rawle, Cov. 109.

It is also objected that the defendant is not liable on this covenant to Chapman's assignee, because it does not run with the land. The reason given for this position is, that no estate passed to Chapman by the deed—the grantors not having any interest in the land at the time. This was the doctrine of the common law as to conveyances of estates less than freehold, which passed without livery of seizin. Noke v. Awder, 1 Cro. Eliz. 437; cited in Rawle, Cov. 383. And as under our modern system of conveyancing, freeholds pass without livery of seizin; it was held at one time that the doctrine became applicable to conveyances of such estates, and in case the grantor had no interest in the land, the assignee of his grantee could not sue upon the covenants, because they only passed as an incident of the estate. But this doctrine has been modified substantially, so that it may be said that whenever possession is taken under the deed, there is sufficient estate to carry the covenants to the assignee. Beddoe's Ex'r v. Wadsworth, 21 Wend. 123; Slater v. Rawson, 6 Metc. [Mass.] 439; Rawle, Cov. 382 et seq. This doctrine is peculiarly adapted to the early circumstances of this country. For years before the passage of the donation act, the right of the settlers upon the land was a mere possession with an expectation of future title from the United States. Under these circumstances, in all the towns, this possession was conveyed and re-conveyed with covenants for the title expected, and it is proper and safe to hold with these authorities that a sufficient estate passed to carry the covenants to the subsequent occupants and assignees.

It is further objected to these covenants, that they are void, because they are contracts prohibited by the donation act. The second proviso in section 4 is relied on. It reads—"That all future contracts, by any person or persons entitled to the benefit of this act, for the sale of the land to which he or they may be entitled under this act, before he or they have received a patent therefor, shall be void." Waiving the ques-

tion of whether this prohibition extends to future contracts concerning lands which the covenantor might receive, but which eventually he does not acquire under the act and receive the patent therefor, it is plain that it does not include these covenants which were made before the passage of the act. It is a plain case for the application of the familiar rule—the mention of one excludes the other. The prohibition of future contracts is a recognition and affirmance of past ones, otherwise lawful.

Counsel for the complainant also insists, that independent of the covenants in the deed, Fields is entitled to the relief prayed for. In support of this position counsel cites section 6 of "An act to regulate conveyances," the same being included in "An act to enact and cause to be published a code of laws," passed September 29, 1849, and commonly called the "Steamboat Code." Laws 1843-49, p. 139. This section was in force at the date of the execution of the deed. It reads: "The words 'grant, bargain and sell' in all conveyances, in which any estate of inheritance, in fee simple, is limited, shall, unless restrained by express terms in such conveyance, be construed to be the following express covenants on the part of the grantor for himself and his heirs, to the grantee, his heirs and assigns." Then follows the specification of the covenants—namely, of seizin of an indefeasible estate in fee simple—against encumbrances, and for further assurance. This section is taken almost literally from the statute of 6 Anne, c. 35, and was first introduced into the United States in the province of Pennsylvania. Rawle, Cov. 533, 537.

It is difficult to perceive, how it can be even claimed that this deed falls within the operation of this section. It does not contain the words, "grant, bargain and sell," or either of them, or the equivalent of them, but the very reverse—"release, quitclaim and confirm." The deed does not assume to pass or limit an estate of inheritance in fee simple, but as has been shown only the interest of the grantor, which was then well known to all the parties to be merely the possession. Besides the express words in the special covenants restrain the statute and prevent the covenants from attaching. By the language of his covenants the grantor excepts the title of the United States from his warranty and expressly asserts that the title is in the latter, and not himself. The habendum—to have and to hold to him and his heirs and assigns forever, does not affect the question of whether the deed purports to pass an estate of inheritance. These words grant no estate, nor do they enlarge the interest already released by the premises or granting part of the deed. By this clause it is simply declared, that the interest of the grantor, whatever it is, is released absolutely—forever, and not for a limited time, to be by him thereafter resumed. This disposes of the case as to the two fifths interest of which Daniel H.

died seized. The complainant is entitled to a conveyance of the fifth which Daniel H. obtained from the United States.

But the complainant alleges that he has since acquired three other undivided fifths of this half block by the decree in the partition suit. As has been shown in the statement of the bill, while the heirs of Daniel H. and the children of Nancy were tenants in common of the whole of the west half of the donation, and while such heirs and children and the grantees of Daniel H. were tenants in common of certain parcels of such half, the circuit court made a partition of the whole tract as between those two classes—the children of Nancy on the one hand and the heirs and grantees of Daniel H. on the other. By the decree it was declared that Daniel H. in his lifetime was the owner of two fifths of the whole tract, and that the other three fifths was the property of the children of Nancy. It also appeared that Daniel H. had disposed of certain parcels of the tract. From these premises it followed that the children of Nancy were entitled to three fifths in equal parts, and that the heirs and grantees of Daniel H. were entitled to the other two fifths according to their respective interests, or in other words, that such heirs were entitled to such two fifths, subject to the rights and interests of the prior grantees of Daniel H. The parcels affected by the contracts and conveyances of Daniel H., being in the aggregate more than two fifths of the tract, the court, in making partition between the two classes as above stated, was compelled to divide the tract into two unequal portions, and decree compensation in money from the greater to the less to make partition equal.

Thus the greater portion of the tract was allotted to those who represented only the two fifths interest, but for the sake of convenience it may be called the "two fifths tract." The lesser portion was allotted to those who represented the three fifths interest, but for the same reason it may be called the "three fifths tract." By this decree and allotment the interests of the children of Nancy in the two fifth tract were divested, and also the interest of the heirs of Daniel H. in the three fifth tract. The grantees of Daniel H. had no interest in the three fifth tract. They yielded nothing in the partition and received nothing. The decree left their interests as it found them. The exchange of interests was between the heirs and children. What the latter parted with in the two fifth tract the former received, and what the former parted with in the three fifth tract the latter received. Here the partition ended. No partition was made of the two fifth tract as between those to whom it was allotted. Nor was it ascertained and determined to whom it belonged, or in what proportions. It is allotted to a class of persons known or supposed to exist, to some or all of whom it must belong—namely: the heirs, grantees and assignees of Daniel H., who died seized.

It is allotted to them according to their respective interests, and not in definite quantities, divided or undivided. To the heirs the law will give in equal parts all that portion of the tract allotted, not previously disposed of by their ancestor, Daniel H. To the grantees or assignees of Daniel H., the law will give all those parcels or interests in the tract which by any conveyance or contract binding on the heirs, he disposed of in his lifetime. But as between these persons, whoever they may be, the determination of these questions is very properly omitted by the decree, and the parties interested must settle them among themselves amicably, or by judicial proceedings, as may be found necessary or deemed best.

Apply this statement of the operation and effect of the decree in the partition suit to the case of the complainant. Block G is a part of the two fifth tract, and the complainant claims the half of it. By the decree in the partition suit it is in no way ascertained or determined that the complainant is either heir, grantee or assignee of Daniel H., or that he had any interest in the two fifth tract. He brings this suit claiming to be entitled to the half of the block by virtue of the deed and covenants to Chapman, and the subsequent conveyances to himself. He claims under these conveyances, and whatever interest he is entitled to, results from them, and not the decree in partition. As has been shown, the complainant at the time of the decree had an equitable estate in an undivided one fifth of the half block and no more. As to this fifth he is now entitled to a conveyance of the legal title from the heirs of Daniel H., by reason of the covenant in the deed to Chapman, and it may be assumed for the present that he has the legal estate therein. Prior to and at the date of the partition the other four undivided fifths of the half block belonged— three fifths to the children of Nancy, and the other fifth to the heirs of Daniel H. As has been shown, this three fifths was by the partition vested in the heirs of Daniel H., in consideration of their interest in the two fifth tract being vested in the children of Nancy, and the payment of the owelty deemed necessary to make the partition equal.

The interest of the complainant was not diminished or increased by the decree. The decree left him as it found him, except that it diminished the number of his co-tenants or persons with whom he held in common. Before the decree he was practically the owner of an undivided fifth of the half block, and his co-tenants and owners of the other four fifths were the children of Nancy and the heirs of Daniel H. Since the decree, and by virtue of the decree, the heirs of Daniel H. are the owners of these undivided four fifths, and the complainant is tenant in common with them alone. It follows that the complainant acquired no further or additional interest in the half block by the partition. The nature or quantity of his interest has never varied or been affected by the partition and exchange between the children and the heirs. He claims under the deed and covenant of Daniel H., and not otherwise. If by these he would have been entitled to the whole interest in the half block, as against Daniel H., or his heirs, the decree would have reserved it for him. But by the deed and covenant he is only entitled to an undivided fifth of the half block, and the decree allotting this half block to the heirs and the complainant according to their respective interests, does not nor should not increase or diminish the interest of the latter. His interest, as now ascertained, was an undivided fifth, and he cannot take more, except at the expense of the lawful owners—the heirs of Daniel H.

Upon this point, the argument for the complainant is sought to be strengthened by appeals to the fact that he has made valuable improvements, and what is called in the statement of the bill, "the equities in partition." But certainly this is all irrelevant and beside the matter in controversy. The complainant cannot enlarge his interest in the land, by making improvements upon it. This is not a suit for partition. When partition is sought between the complainant and his co-tenants, the heirs of Daniel H., it can be properly considered and determined, to what extent the former may be equitably entitled to have the value of his improvements estimated in his favor in the partition, provided his fifth cannot be set off to him so as to include them. In such suit, equity may also apportion the owelty charged upon the half block, so as to relieve the complainant's fifth from any part of it, if it should be found proper and equitable to do so. The complainant to protect his interest from sale, deemed it necessary to pay this owelty, and has paid it. Because, as he alleges, the defendant and her co-heirs suffered and encouraged him to pay the owelty, he claims to have acquired some additional interest in the half block. This claim is without any foundation in law. Whoever deemed it necessary to protect his interests in the land might pay the owelty, but he thereby acquired no right as against the real owner, beyond the right to be re-imbursed the amount paid for the benefit of the latter, with a lien upon the land as security. The decree in this respect, is too plain to be misunderstood. Whoever paid owelty, paid it upon his own judgment, and could not thereby acquire or affect the rights of others, whether they had notice of it or not. The owelty was not apportioned among the persons who owned the two fifth tract, for the same reason that the land was not—the court did not know or undertake to determine, who the owners were, or what was the relative or absolute proportion or quantity of their interests. The owelty was charged upon the land in gross, and not upon any portion of it or

to any particular person. The land remains as security to any one, who from necessity or misapprehension, may pay beyond the extent of his real interest. But whether a mere volunteer, who confessedly had no interest in the land, could claim this security, may be a question. As between the heirs and the complainant, it appears to me that no part of the owelty is chargeable upon the complainant's fifth. The cause of and consideration for owelty was the excess in value of the land which the heirs got in the partition, over that which they thereby yielded to the children of Nancy. In a suit for partition between these parties, the court, upon this view of the case, ought to apportion the owelty, so as to discharge the complainant's fifth from any part of it, or by some means compel restitution or make compensation, for so much of the sum as has been paid on account of such fifth. This, it appears to me, is what equity would do in a suit for partition between these parties; but the occasion for furnishing this relief to the complainant does not arise in this suit. This suggestion rests upon general principles, and is equally applicable to any distinct parcel of the two fifth tract, upon which owelty was charged in gross, and which may be owned by the heirs and grantees of Daniel H. in common.

But there is a special circumstance in this case, which, as between the complainant and the heirs, must have the effect or operate to relieve or discharge the complainant's fifth from the owelty. The heirs are bound by the covenant of their ancestor, to convey to the complainant, his undivded fifth as their ancestor obtained it from the United States—free from encumbrances, or respond in damages for the breach of the covenant, so far as they have received assets. The owelty is an encumbrance, suffered during the time of their interest in the land, as heirs, and of which they have received the benefit.

The complainant also claims, that independent of the paper title set forth, there has arisen an equitable estoppel in pais, sufficient to bar the rights of the heirs in any part of the premises. The alleged declarations of Daniel H., and his and the heirs' notice of the complainant's possession and improvements and their acquiescence therein, are relied upon as constituting this estoppel. 2 Am. Lead. Cas. 754, upon the doctrine and effect of license to do some act or enjoy some privilege upon the land of another, is cited in support of this position. The authorities cited have no bearing upon the question; and moreover the facts alleged in the bill, do not show even a license for any purpose.

This is a question of title—ownership of the soil, and not a mere easement or privilege. Titles would not be worth the paper upon which they are written, if they could be called in question or destroyed in this way—by the proof of stale parol declarations inconsistent with or in opposition to them. As to these declarations the dead cannot answer. If allowed to be shown, in bar of the acknowledged title of the ancestor, the heirs would hold their property upon the insecure tenure of the testimony of interested witnesses and claimants, as to matters resting only in parol, which if false or exaggerated, are incapable at this late day of either contradiction or explanation This would be to offer a bounty for frauds and perjuries, instead of preventing them as the statute of frauds commands and intends. In 1852, when complainant purchased from Dobleblower, this land belonged to Nancy. She was then living, and to whom it would go upon her death was not known to any one. She had the power of disposing of it by will. If she died intestate, and before patent, and Daniel H. survived her, he would be entitled to a certain interest in it, depending upon the number of children she left living. But at that time Daniel H. had no interest. Under these circumstances, he is said to have assured the complainant that the title was good, and thereupon the latter purchased of Dobleblower. Waiving the question of what title is referred to by this ambiguous expression—whether it be that of Dobleblower, Chapman, Daniel H., or Nancy, this assurance amounts to nothing more that the expression of an opinion by a stranger—a person who had then no interest in the land and could not know that he ever would have. This expression of opinion as to the existing title—that it was good—could not create an estoppel against Daniel H. as to a subsequently acquired estate in the land. No special relation, implying trust and confidence, is shown or pretended to have existed between these parties. Daniel H. was not the guardian or attorney of the complainant. No misrepresentation of facts or concealment of them or fraudulent purpose is imputed to Daniel H. The complainant had the same means of knowing the state of the title that Daniel H. had. The latter is not responsible to the former for the correctness of his opinions about the title, even if these opinions influenced the complainant to make the purchase—which is extremely doubtful, even upon the face of the bill. So far as Daniel H.'s opinions resulted in written acts—his deed and covenant—he is responsible, and no further. If the complainant proposed to purchase upon the opinion of another as to the title, he should have taken the advice of counsel, and not Daniel H. Of course the subsequent repetitions of this assurance by Daniel H. do not vary the effect of the first one. Moreover, they are perfectly immaterial in any view of the matter, as the purchase was made before they were uttered, and could not have been influenced by them.

As to the other branch of this alleged equitable estoppel—the possession and improvements of the complainant—the case is equally clear against the complainant. During the tenure of Nancy in the land she was

a married woman, and the complainant could not acquire any rights as against her, on account of her silence as to his occupation and improvements, whether she had notice of them or not. And if this were otherwise, the land did not descend from her, so as to be bound for her acts or omissions, in the hands of Daniel H. and the children. Her estate in the land terminated with her death, as well as her enjoyment of it. Thereafter a new estate in the land commenced in Daniel H. and the children, which they took directly from the United States. During the lifetime of Nancy, Daniel H. and the children had no interest in the land, and could not be affected by notice of possession and improvements, more than any other stranger. After the death of Nancy, they became the owners of the land, and were capable—except those who were minors—of affecting their interests by their acts and doings, so far as the law allows them to be sufficient for that purpose.

But the whole idea upon which this branch of the case rests is a novelty and without authority of law. It is, that the complainant could acquire the title to this property as against the lawful owners, by being in possession and improving it, to their knowledge, for a less period than that prescribed by the statute of limitations. Mere possession, unless it be adverse and continued for twenty years, does not give title as against the owner. Possession is evidence of title, and sufficient evidence, in the absence of better. But here the title is shown beyond a doubt to have been in the defendant and those under whom she claims, all the period of the complainant's possession, since the death of Nancy. The possession of the complainant, if adverse, might ripen into title by lapse of time, and in such case it would be immaterial whether any one had notice of it or not. For the same reason, if sufficient time had not elapsed to work a transfer of the estate by reason of the possession, the owner's right is not affected by the possession, however distinctly he had notice of it. As was said in Chapman v. School Dist. No. 1 [Case No. 2,607]: "The owner of real property may rest upon his title, and is not required to be always upon the premises, asserting his title, as against the world or any less number of persons, whom he may permit or suffer from time to time, to be in the temporary occupancy or enjoyment of it." Admitting then, for the present, that the complainant was in the adverse possession, and that Daniel H. had notice thereof from the time he became owner of the land, it in no way benefits the complainant. It was the business of complainant to know whether he was upon his own land or that of another. But it is apparent and undeniable that the complainant's possession continued as it commenced, under the deed to Chapman and the mesne conveyances of Chapman to Dobleblower, and the latter to himself. By force of these,

upon the death of Nancy, he became equitably entitled to an undivided fifth. Thereafter he was tenant in common with Daniel H. in his lifetime and his heirs since. His possession was not adverse to their title or right, but consistent with, and would not in any length of time affect their interest in the land. Tenancies in common would be dangerous tenures, if one tenant could occupy and improve the other out of his estate —particularly if that other was a minor, resident in another state.

It is also alleged that Daniel H. had notice of the complainant's possession when he purchased the fifth of Isabella Ellen, and, therefore, he and his heirs are estopped from asserting their title to such interest. How this can be, I cannot see. Daniel H.'s purchase of this interest, worked no wrong to the complainant. It was Isabella Ellen's property, and complainant, as against her, had no claim to it, either at law or in equity. She had an undoubted right to dispose of it, and Daniel H. to purchase it. If the complainant being in possession, did not prevent her from selling, as it did not, it did not prevent Daniel H. from purchasing. If Isabella Ellen, had agreed by a valid contract to sell this fifth to the complainant, or had for any other reason been bound in equity to convey it to him, and Daniel H. had interfered and obtained the conveyance first, with notice of the complainant's possession, then, this matter of notice would be material. But as it was, it amounts to nothing. If one tenant in common cannot dispose of his interest to a person who has notice of his co-tenant's possession, estates in common would often be inalienable. This, I believe, disposes of all the material questions raised and argued by counsel on the demurrer.

The demurrer is overruled, at the costs of the defendant, and unless leave is given to answer, there must be a decree for the complainant, that the defendant, by a proper conveyance with covenants of warranty, release to the complainant, her interest in the undivided fifth of the premises, which her ancestor obtained from the United States, and which she inherited from him.